hearing today is TVPX ARS, Inc. v. Genworth Life and Annuity Insurance Company, number 22-11185. I'll let the parties have a chance to get set up, and then, Mr. Mattson, when you're ready for rebuttal. Good morning, and may it please the Court, Eric Mattson on behalf of Genworth Life. Back in 2004, Genworth bargained for what it thought would be a lasting peace with respect to a transaction settlement agreement it bargained for and received, a forward-looking release, a covenant not to sue, and a provision that expressly allowed it to continue administering the policies at issue in that case as it had done prior to that time. Now, we invoke that settlement agreement and the judgment that embodied it in saying that a later claim filed by TVPX was barred by res judicata. We came up to this Court, and this Court agreed with most of our points about why res judicata applied. So I think we're all very familiar with the procedural history here, especially since we wrote a comprehensive published opinion beforehand. So my question is this. We give you the limited factual question that we think hinges on the res judicata question. We send it down. The district court issues an order. We'll talk about the order. I know you have some issues with it. But do you agree that the outcome of that question is dispositive for res judicata? I do. And the question is, I understood it, because depending on which aspect of this Court's opinion you look at, you can phrase it in different ways by going to the court. I think we — I looked — I think three separate times we phrased it in a very narrow and specific way. I'll read to you exactly what I understand the remand instruction to be and what the instruction to the district court was, which was this. We remand, quote, for limited discovery on whether Jen Worthey Insurance Company in any way changed how it calculates and charges COI, cost of insurance, since the McBride settlement, the 2000 case. Correct. Okay. So the question is, was there a change in how we calculate and charge cost of insurance? Right. And the record was quite clear in showing that we had not — I just want to be clear, though. Before we get there, you agree that the answer to that question is dispositive of the res judicata question? The way I would phrase it is, did Jen Worth change how it calculates and charge cost of insurance? That's what I'm reading from the court's opinion. Is the — I read to you what I understand to be the limited remand instruction. We said it two separate times, once at the end of that section and another at the end where we say, this is what we want a district court to do. We tell them, do this. So that's the question. And my question to you is a very simple one, which is, do you agree that the answer to that question is dispositive of the res judicata issue? The only quibble I would have, Your Honor, is that — I'm reading from the court's opinion when I say the question is, did Jen Worth change how it calculates and charge cost of insurance? I'm reading from the court's opinion. In any way? That's — I don't think — I don't think if Jen Worth Actuary started using a number two pencil instead of pen to do some calculations, that that would really make a difference. I don't think that's what this Court was saying. I'm not sure how that would be a calculation or charge change if it was a number two pencil, but my question to you is, if — did we ask the limited question of whether in any way the insurance company Jen Worth changed how it calculated or charged COI since the 2007 law? I — the way I read it, Your Honor, that's what the — the remand was to explore that question in discovery. And to answer — and the answer to that question, do you agree, is dispositive of res judicata? I would not, I don't think that in any way, because that's a pretty broad — I have to tell you, that's where I'm having a problem. Yeah. And I think that's — that seems to be, in my view, the dispute here. Because we told the district court to do something very narrow. It did it. It answered the question. And then now you're coming to us and saying, well, A, there's some problems with the district court order. But ultimately, the answer to that question really doesn't answer the res judicata question. And why would we have gone through the trouble of sending it back if that was not the dispositive question to res judicata? I'm — I'm mostly agreeing with you, Judge Locke. I'm — I'm just looking at — at the part of the opinion that says — does not use that phrase in any way. Now — It's in any way twice that I could — that I count. Well, the Court — there's not in any way qualifier in the language that I'm quoting from. The Court was not entirely consistent on that point. I will say, Your Honor, even if you introduce the — Just to be clear, we said it on pages 128 at the end of the res judicata section, and we said it at the end in our remand instructions on pages 1329 and 1330. Right. That was — I agree. I agree the language says what it says. And we said it in any way, both times. Well, but it also said in this third time, did not use that qualifier. But — but even if we say that the — the in any way qualifier belongs in the question that the district court was to answer, the answer to that question, even with the in any way qualifier, would be no, there was no change. How can we — now, I — let me say this. I'm certain there is tons of evidence supporting what you just said. But how, when I read the Stern report, could I — could I say that where there is contrary evidence, that the district court could not make a finding that in some way there has been a change in calculation of COI since 2004? Because of two undisputed facts that even Mr. Stern conceded. Fact number one, the rate table has remained unchanged for decades, since 1995. That goes to charges. That doesn't go to calculation. It sure — of course it does. It goes exactly to — to charges. It goes to — I agree with you. It goes — and it goes to calculation. So there's two facts, as I said. Counsel, I just want to read to you a few portions of Mr. Stern's report. This is — I'm talking about docket entry 328-11 and starting at page 19. Before the McBride settlement and final judgment, Genworth's practices and procedures for determining COI rates for the contender product and the Whitaker policy was to maintain COI rates reflecting mortality expectations. Under this approach, Genworth would adjust COI rates to — in proportion to the change in Genworth's mortality expectations. This approach is consistent with the Whitaker policy, stating COI rates were, quote, determined by us according to expectations of future mortality. And then on pages 25 and 26, it is clear Genworth has changed its COI determination practices since the McBride action and no longer maintains COI rates for the Whitaker policy and contender product, reflecting just Genworth's current mortality expectations. Instead, current practice since 2014 is to adjust COI rates in light of the contender product's overall projected profitability, considering all anticipated factors. This means mortality has been relegated and subordinated to just one of many factors that can but do not need to be considered by Genworth, and Genworth's COI rates are no longer determined, quote, according to expectations of future mortality. I — I — I — I depose Mr. Stern, and I understand that's — How's that not a change in how — in how it calculates? Because, Your Honor, the — the — here, let me explain how — how these cost-of-insurance charges are calculated. You take a rate table. You see where the insured falls on that rate table. You take the rate that person falls into and then follow the — the mathematical formula in the policy to determine the cost-of-insurance charge, okay? Take the rate table, do the math. That spits out the charge. The rate table has remained unchanged since 1995. That's undisputed. And the mechanics of taking that rate that applies to that insured and having it spit out the — the charge has remained unchanged forever. That is — that part you just said is inconsistent with the Stern report. No. And we quote — it's not, because if you look at — we quoted Mr. Stern's deposition where he conceded that second point. He conceded that the — you take the rate table and apply the — What he conceded was that mortality was a factor in both sides. But he did not concede that the — that there was no adjustment in how calculations were done. No. Respectfully, Judge Locke, we quoted this in our brief. His — and I took his deposition. He conceded that when you take that rate that — that you find in the rate table and apply the math and it comes out the other side with the charge that shows up on the insured's statement, that did not change one iota. That has remained the same since the 1980s. And Mr. Stern conceded that. He's trying to make a different point and say that, essentially, the — Genworth should have changed the rate table, and it would have changed the rate table if it were doing things the way it had done way back in the — in the 1990s. I have a hard time reading both his deposition and his report to be consistent with what you just said. I'm not — I don't disagree that there isn't evidence in the record supporting what you're saying. What I'm — what I'm saying is there seemed to be a classic conflict in the evidence here that the district court resolved contrary to your client. If there's — respectfully, Judge Locke, I would urge you to look at what we cited from — from Mr. Stern's deposition, and that testimony makes clear that what I just said is 100 percent true. The points he's making are an entirely different issue that is not relevant to whether Genworth changed in any way how it calculates and charges cost of insurance. Thank you. You have reserved five minutes for rebuttal. Thank you. Mr. Speier? May it please the Court, Nick Speier for Appellee TVPXRs, Inc. I'd like to begin where Judge Locke began with Mr. Mattson. We completely agree that this Court remanded, and that that — the answer to that remand question, whether Genworth in any way changed or altered how it calculated or charged COI, is the question down below. We — Why don't — why don't you begin where he ended? So your opposing counsel says very emphatically that Mr. Stern, which is really the basis of your — your contrary case, said and admitted in deposition that there was no changes in the rates and no changes in how those rates — how the ultimate charges were calculated. So no change in calculation, no change in charges. We completely disagree that that's what Mr. Stern testified to. Mr. Stern, in his report, as Your Honor read during Mr. Mattson's presentation, makes very clear that there was a number of fundamental changes in how Genworth calculated and charged its COI rates. Specifically, prior to McBride, Genworth tethered its COI rates to its mortality expectations. Post-McBride, it does not. Genworth focuses on the rate table and on this conversion formula from COI rates to dollars. But that ignores that — the question that this Court previously raised in the prior — in the prior opinion, which is, are the COI rates in the COI rate table tethered to mortality expectations? And Mr. Stern did a very thorough review of all of the evidence. Mr. Stern, his report, made very clear that that part of how Genworth calculates and charges COIs has changed. And Judge Landau below, it's perfectly plausible for him to have relied on the evidence in the Stern report and the evidence underlying the Stern report to find that Genworth's practices had — had changed pre- and post-McBride, to use his words, were different in kind and degree, that the conduct that we allege in our Virginia lawsuit had not yet occurred at the time of McBride. What about the fact that we do have some testimony from the Genworth Corporate Risk Department, Mr. Parker, that around 2014, Genworth merely was attempting to document processes that it already had in place and not to necessarily create new and different processes? So that was something that was briefed down below to Judge Land, and he was able to review that and look at the contrary testimony. Specifically, Mr. Parker was the actuary in charge. Ms. Layton testified that she had no idea what Genworth had been doing pre-2014. She never looked. And other actuaries discussing what Genworth had done pre-McBride testified that Genworth did something very different. It maintained a fixed relationship, in the words of one actuary, between COI rates and mortality expectations. Judge Land, down below, had all this in front of him. The party's briefing, like up here, was very clear on what the factual contentions were, and he was perfectly — he did a perfectly plausible job of going through. We think he did an overwhelmingly correct job, but certainly plausible, that he made the fact findings that he did. And I think here you're — What did Mr. Stern concede in his deposition? He conceded that the rate table that Genworth used was correct, and that the conversion formula, the COI rate-to-dollar conversion formula, was the same. We don't disagree. Isn't that exactly what your opposing counsel said when he was up here? He said that there's a rate table, there's a multiplier, and that equals the charge, and those have remained the same, and that's the end of the ballgame. That's exactly what he said when he was up here. What we disagree with is that the agreement that the rate table and the conversion formula have stayed the same is the broader concession that Genworth has not altered how it calculated or charged in any way COI rates pre- and post-McBride, because, again, they altered in a very fundamental way, which is the tethering of COIs to mortality expectations has changed pre- and post-McBride. And Mr. Stern never conceded that. But how, if the two inputs that give you the charge have not changed, could that change how it either is calculated or the charges that result from it? Because part of how you calculate the COI rate is to determine what that COI rate should be. And if Genworth had followed its pre-McBride practices, I think it's important to take a step back and look at why the rate table that was in effect throughout the time was created. It was created in 1995, and we document— It was part of a tax change we—go ahead, sorry. No, no, that was actually a separate one in 92. That 92 rate table was changed in 95. This is DOC 327-5. This was the 1995 redetermination. And that occurred because there was a change in mortality expectations. And what Genworth did was Life of Virginia at the time, Life of Virginia reduced or there was a worsening of mortality, and Genworth then changed COI rates and increased them commensurately. That's why the 1995 redetermination occurred. That created the rate table in place today. Had Genworth continued its practices post-McBride, it would have changed that rate table, again, consistent with its pre-McBride practices in light of mortality improvement. And I'd like to—go ahead. I have to say it's hard to understand if there's two inputs in determining what the COI is, the rate table multiplied by some factors, and if neither of those things changed, and everyone agrees neither of those things changed, then it's hard to see how in any way the calculation and charges for COI changed since 2004. I think the prior opinion, Your Honor, addressed this specific question. It described that there had to be — the question is whether Genworth was engaged in the same offending conduct. That's the question. And then this prior opinion, or this Court, in its prior opinion, described what that offending conduct is. Genworth is not determining COI. See, I have to say, though, that's inconsistent with how you started off and how I started off with your opposing counsel, which is the district court was asked to do something very narrow on remand. It was asked to take evidence and answer a question. And then based on that fact question, it then comes back to us, that question being dispositive. So it's not a matter of context of what the larger complaint is or not. That's not it. It either changes or didn't change. And if it didn't change, then res judicata applies. And if it did change, then there is no res judicata. That's it, right? Correct, Your Honor. We agree with that. Okay. So my question again is, if there's agreement between the parties in the evidence that was taken that there are two inputs in determining COI, and Input 1 has not changed since 1995, and Input 2 has not changed since at least 2004, and it results in the same charge, how then has there been a change in the charges and calculations? So we don't agree that it results in the same charge, because pre-McBride, that charge that comes out of that formula was tethered to mortality expectations. Because if the rate is tethered, the charge is tethered. And I read that part of the Stern report. I understand it. Correct. So we think there's a very, again, very fundamental way that how they calculate or charge COIs, that there's a change fundamentally between what happened pre-McBride and post-McBride. But if that were true, wouldn't that show a change in Input 1 or Input 2? In other words, if, in fact, and again, let's take whatever concessions were made a deposition out of it. If, in fact, there were other factors that play in determining these things, then wouldn't either the rate table change or the multiplier change? Had Genworth followed its pre-McBride practice, the rate table should have changed. And that's, I think, the critical point here, is that Genworth's statement that the rate table didn't change, which they view as a favorable statement, is actually dispositive in the other direction. Because had they followed their pre-McBride practices, that rate table would have changed post-McBride in light of changes in its mortality expectations. And so, you know, maybe a simple analogy here maybe would help illustrate our point. Imagine that you are arguing that there was a change in how a gas company priced oil into the gasoline price. That's the question. If the gas company said, well, no, when you go to the pump, it's still just price per gallon times gallons expended, that wouldn't answer the question of whether the price per gallon had changed in how it was priced. We're making the exact same argument here, that one of the inputs into that formula, how that input was determined, has fundamentally changed pre- and post-McBride. This is, again, what the actuary referred to as a fixed relationship pre-McBride. And that fixed relationship no longer exists because mortality has been relegated to just one factor. Show me whether it's in Mr. Stern's report, his deposition, or somewhere else on the record, does it say that the rate table would have changed, but for us focusing on different factors? Give me one second. In other words, like a back to the future, if the alternate reality was pre-McBride had gone, the rate table would have gone this way, but in alternate reality world, it now is here. Where is that evidence? Give me one second. Let me find that in the Stern report. This is paragraph 68 of the Stern report. He says, Mr. Pfeiffer's statement that the rate scale has not changed since the McBride settlement is irrelevant. Genworth's COI rates for the Whitaker policy change every year. Further, Genworth's COI practices could and did change even if the rate scale did not. And then skip the next sentence. If Genworth's redetermination practices remain the same pre- and post-McBride, then Genworth would have adjusted the COI rate scale at some point after McBride to lower COI rates to reflect Genworth's improved mortality expectations since 2005. Far from suggesting consistency, Genworth's failure to adjust the rate scale since McBride confirms Genworth has fundamentally changed its approach to COI rates and mortality expectations after the McBride settlement and final judgment. All right. So that's your best evidence right there. That's in Mr. Stern's report. There's, we believe, other evidence that shows DOC 327-5, which is the redetermination that created that rate table, shows exactly how it was created. We now know that that's no longer what Genworth does. But Mr. Stern addressed that point directly in his report. Okay. So part of the reason that we are here today is because we have, we had asked the district court to conduct factual findings and report back, and we have that order. And that order has, as best I can tell, two sentences addressing the factual findings of the court. In the Virginia action, TVPX relies upon conduct that occurred after the McBride settlement in support of new claims that could not have been asserted in McBride because the conduct had not yet occurred and was a different type of conduct, albeit similar. Because this new alleged conduct is different in kind and degree and not a mere continuation of the same previous conduct, TVPX presents claims in the Virginia action that do not share an identical factual predicate with the claims in the McBride action, nor are they covered by the McBride release. How can we, based on those two sentences alone, conduct meaningful appellate review if we don't know what exactly went into that determination by the district court? Should we remand and ask for further explanation? I think you need to also, when looking at the district court's order, look at the previous page, page 7, where he actually describes the conduct that he found did not occur. And so if you just read those sentences sort of in isolation, you're — it ignores that on the previous page he says, here TVPX's amended complaint alleges that from 2013 through 2018, Genworth calculated cost of insurance in a way not consistent with mortality expectations. And then he further describes it as Genworth refused to decrease cost of insurance rates despite improved expectations of future mortality, resulting in cost of insurance charges that exceed what Genworth is contractually allowed to charge. And then it goes on, the district court order on that page goes on to further talk about TVPX's contentions. But I still am not seeing the factual findings from the district court, which is what we directed the district court to examine this issue and find out if there's any — if this is different conduct. And so I see what he's pointing to in the complaint, but I don't see how we are supposed to review what the district court determined on — as of whether there's a factual difference or not. So two points there, Your Honor. First, on the — what the district court said, he — he said what he thinks the conduct that's occurring is now. That's what's in our amended complaint. And then he found, as a matter of fact, that conduct had not occurred. This court in FTC, which we cite in our brief, described the standard that a district court is supposed to do in this situation. It's — it says a judge need only make brief, definite, pertinent findings, and that if the judge does that and there's a record that the judge points to that this And, again, I'll quote from that opinion. Sufficient record evidence to support the findings, a district court need not state the evidence or any of the reasoning upon the evidence. Judge Land did exactly what he was supposed to do. He made a clear finding. Certain conduct had not occurred before a certain date and was different in kind and degree than pre-McBride conduct. This court can look at the record. The parties both clearly briefed what their positions are and see exactly what Judge Land was looking at, and this court can determine whether it's plausible. I see I'm running out of time. I'd like to address one other point briefly, if that's okay with Your Honor, before I sit down. You have seven seconds. We also would like to note that Genworth failed to establish that its mortality expectations had improved at all pre-McBride, which is a core part of our claim. And with that, the Court should affirm. And thank you, Your Honor. Thank you. Mr. Mattson, you have five minutes. Could you address one issue, sir, as to the counterclaim that it would be futile for this Court to rule on that in light of this narrow issue before the Court, which is dispositive? I apologize. The counterclaim, could you address that it would be futile to rule on it because we have a narrow issue before this Court, which is dispositive? Well, it would not be futile. The counterclaim itself is not futile, and I believe that this Court can and should address the viability of that counterclaim now, because it was raised right along with our motion to enforce the settlement agreement. And we've presented that issue twice to the District Court and once to this Court, and to date, none of those courts have addressed the actual merits of whether we have a viable counterclaim under the Bolton case from the Virginia Supreme Court. And I don't see any particular prudential reason for this Court to pass on that question in the first instance. Is there a rule-based reason? I don't know of any rule-based reason to pass on that either. An amendment requires — amendment generally is done under Rule 15, right? Correct. But you agree that Rule 15 is unavailable to you right now? I don't, Your Honor. This is an odd procedural posture, because it's not — it's not at all. We have cases saying that post-judgment, Rule 15 is unavailable. That's certainly true if, let's say, I'm a plaintiff and I lose a motion to dismiss. Judgment is entered against me. I file a Rule 15 motion. That's not the way to go about things. This is different. And the reason for that, Your Honor, is that the District Court retained jurisdiction to enforce the settlement agreement, which is precisely what our counterclaim is seeking to do. In addition for breaching a part of the settlement agreement. Those are different things. I respectfully disagree with that, Your Honor. I think we are trying to enforce the settlement agreement. So — so — but — but I guess it would be the answer to the initial complaint in the McBride case. And so post-judgment, Rule 15 is unavailable to you. Our case law couldn't be clearer. So the standard, as I understand it, is Rule 59 and Rule 60. How, under Rule 59 and Rule 60, are you entitled to that relief to open a case that's been closed since some people in this room have been born? Yeah. I understand the question, Your Honor. We are entitled to do that because of the provision that I just referred to in the judgment where — A reservation of jurisdiction and allowing to enforce does not allow you to go in and do whatever you want. That's why you were required to do the all writs for this. You weren't able just to come in and say enforce. You had to go and say, you're going to take our most extraordinary and narrow writ in order to do something very narrow and extraordinary. That now you're asking to do not just that, but untethered from anything to do with the writ, something that is — amend a — a complaint and a judgment that's been closed for a couple decades. I respectfully disagree, Your Honor, with the idea that it's untethered to what we're trying to do with the writ. It's part and parcel — Can you show me — can you show me in any of our cases, the Supreme Court, or really any circuit that has allowed the all writs to not just enforce under res judicata, but allows you to amend a counterclaim or add a counterclaim to a case that's been closed? I cannot, but I also can't point you to a case that said you can't do that. Right. In other words, this is a very unusual — Generally in this area where we're only allowed to act with positive authority, that generally is a sign that maybe we shouldn't act. I understand. I do want to just underscore one point that came out, I think, when opposing counsel was standing — standing up, which is that he confirmed what I had tried to explain to the Court about how this — how this actually works. When we were first in front of this Court a number of years ago, the Court, both at oral argument and in its opinion, was — seemed concerned, expressed concern that perhaps TVPX was right when it alleged, contrary to its earlier complaint, that we had actually raised rates. It turned out that that was not true, and that fact, combined with the other fact that we discussed before — The evidence is that the rate table had not changed and otherwise would have changed because of a change in policy. Is that not a change in any way to the — to the way COI is calculated? Absolutely not, Your Honor. And the best way I can explain that is if you had — if any lawyer had been advising Genworth back in 2004, you've just bargained for this forward-looking relief. What's the best way for you to protect yourself? What's a safe harbor for — for yourself with respect to your cost insurance rates? Counsel, the problem with that, and it's a problem with where you started, is you may — you may get a remedy. You may get a release in the underlying proceeding. You're asking for something extraordinary here. In other words, those are two separate things. You correctly advised your client. You may end up getting — the release may cover this, and you may end up in a counterclaim in the underlying proceeding getting the relief that's there. But that is separate and apart from whether you're entitled to res judicata. And we are entitled to res judicata because the judgment incorporated the settlement agreement, which included the forward-looking release and the provision that allowed us to continue administering the — the policies the way we had — had done previously. How do you reconcile what the district court made a finding that Ginsburg did alter the way in which it calculated COI rates post-Medbride, given that we have to consider great deference? It's hard to — as Judge Branch was pointing out, it's hard to — to know what the district court was talking about there because the analysis was so sparse. It is true that as a — in any individual insured, and this is inherent in the nature of life insurance, that as an individual insured gets older, the rate goes up. But that's built into the rate table that has remained unchanged since 1995. Thank you. Thank you. Thank you. Thank you both. We have your case under advisement.  Thank you. Our third and final case is —